

**ORDERED in the Southern District of Florida on July 10, 2012.**

*A. Jay Cristol, Judge*
*United States Bankruptcy Court*

___

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

SAGAMORE PARTNERS, LTD.,

        Debtor.
_____/

Case No. 11-37867-BKC-AJC

Chapter 11

**MEMORANDUM ORDER SUSTAINING OBJECTION
OF JPMCC 2006-LDP7 MIAMI BEACH LODGING, LLC TO
SAGAMORE PARTNERS, LTD'S DISCLOSURE STATEMENT**

THIS CAUSE came before the Court for hearing on May 22, 2012, at 2:00 p.m., upon the Objection (the "Objection") [ECF No. 137][1] by JPMCC 2006-LDP7 Miami Beach Lodging (the "Secured Lender") to the Disclosure Statement [ECF No. 111] (the "Disclosure Statement") filed by Debtor Sagamore Partners, Ltd. (the "Debtor") in connection with its Plan of Reorganization

[ECF No. 110] (the "Plan").[2]  This memorandum opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## Overview

Pursuant to the Plan, the Debtor proposes to cure monetary defaults under the Loan Documents evidencing the Loan of the Secured Lender.  The Plan provides that, by virtue of the proposed cure, the Secured Lender's allowed secured claim is rendered unimpaired and the Secured Lender is therefore deemed to have accepted the Plan pursuant to 11 U.S.C. § 1126(f).[3]  The parties dispute what the Debtor is required to do to cure the Loan so as to render Secured Lender's allowed secured claim unimpaired in accordance with the requirements of 11 U.S.C. § 1124(2).

For the reasons set forth herein, the Court holds that, to cure the Loan, the Debtor must provide for the payment of all amounts due the Secured Lender under the Loan Documents, including default interest.  Absent such payment, the Debtor may not treat the Secured Lender's claim as unimpaired under the Plan.

Because, as presently structured, the Plan does not provide for the payment of default interest to the Secured Lender, the Plan is facially unconfirmable over the objection of the Secured Lender and approval of the Disclosure Statement is therefore denied.  *In re Valrico Square Limited P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990); *Unichem Corp. v. Gurtler (In re Unichem Corp.)*, 72 B.R. 95, 100 (Bankr. N.D. Ill. 1987), *aff'd*, 80 B.R. 448 (N.D. Ill. 1987).

---

[1]  *Also see* the Debtor's Response to the Objection [ECF No. 160] and the Secured Lender's Reply [ECF No. 168].
[2]  Unless otherwise defined herein, all capitalized terms shall have the meanings provided therefor in the Plan.
[3]  The Debtor does not dispute that it did not make debt-service payments under the Loan from August 2009 until the commencement of this bankruptcy case; however, the Debtor has commenced an adversary proceeding against the Secured Lender [Adv. Proc. 11-3122-AJC] in which the Debtor contends that such payment default is excusable as it was purportedly instigated by the Secured Lender. The Court need not resolve that dispute by this order. The parties appear to be in agreement that all the Court need do here is determine whether the Plan can be confirmed although it does not provide for the payment of any default interest or other charges arising as a consequence of such default to the extent that that the Court may determine such amounts are due and owing in the adversary proceeding.

**Background**

The pertinent facts appear to be undisputed. The Debtor is the owner and operator of the Sagamore Hotel on Miami Beach (the "Property"). The Debtor entered into the Loan, in the principal amount of $31,500,000 (the "Loan Amount"), on or about March 24, 2006. The Loan is secured, *inter alia*, by a first priority mortgage on the Property. Pursuant to the Loan Documents, the Debtor was obligated to make interest only payments on a monthly basis until the maturity date of the Loan, April 11, 2016 (the "Maturity Date"), at which time all amounts remaining unpaid, including principal and interest, would become due and payable. Pursuant to the Loan Documents, interest on the Loan is calculated at the rate of 6.54% per annum (the "Interest Rate"). Moreover, the Loan Documents provide that so long as an event of default exists in respect of the Loan, interest shall accrue on the unpaid Loan Amount at the rate of 5% above the Interest Rate (the "Default Rate").

The Debtor acknowledges that it failed to make monthly interest payments in respect of the Loan commencing with the payment due August 11, 2009 (the "Payment Default Date"), until after the commencement of the Debtor's bankruptcy on October 6, 2011 (the "Petition Date") when it undertook to make adequate protection payments as a condition of its use of the Secured Lender's cash collateral.[4] Therefore, putting aside the allegations in the Adversary Proceeding which will be dealt with in that context, pursuant to the Loan Documents, the Default Rate became applicable from the Payment Default Date. According to the Disclosure Statement, by letter dated September 28, 2009, LNR, on behalf of the Secured Lender, declared the Loan in default, and demanded payment in full of all of the indebtedness due under the Loan.

---

[4] By orders of the Court, adequate protection payments are required to be made in an amount equal to the unpaid Loan Amount times the Interest Rate applied on a monthly basis.

On December 7, 2009, the Secured Lender commenced a mortgage foreclosure proceeding in state court to enforce its rights pursuant to the Loan Documents (the "<u>State Court Foreclosure</u>"). Apparently, the State Court Foreclosure was hotly contested and actively litigated for more than two years until the Debtor sought chapter 11 relief on the Petition Date, two weeks before a summary judgment hearing was scheduled to occur and one month before the matter had been set for trial.[5]

Also in December 2009 (some three months after the Debtor's payment default), pursuant to the Loan Documents, a "lock box" arrangement was activated pursuant to which all hotel revenues were directed to an account from which the costs and expenses of operating the hotel were advanced to the Debtor and any surplus was retained by the Secured Lender as cash collateral for the Loan.[6] Pursuant to the Loan Documents, the Secured Lender was free to apply the funds on deposit in the "lock box" in such order and priority as it determined.[7]

According to the Secured Lender, it was owed approximately $41 million as of the Petition Date, inclusive of approximately $4.7 million of interest calculated at the Interest Rate and approximately $3.5 million of default interest calculated at the Default Rate.[8] At the Petition Date, there was some $3 million in the "lock box" which the Debtor concedes would not have been sufficient in any event to satisfy interest due the Secured Lender at the Interest Rate, let alone attorneys' fees, costs, expenses or interest at the Default Rate due the Secured Lender.[9] In other words, even if the Secured Lender had applied the funds remitted to the "lock box" to the payment obligations of the Debtor as they came due, there would not have been sufficient funds

---

[5] *See* State Court Foreclosure Docket Sheet, ECF No. 56 at Ex. A.
[6] *See* Proof of Claim 20-2 (Loan Agreement, Sec. 2.7.2(a)).
[7] *Id.* (Loan Agreement at Sec. 2.7.2(b)).
[8] *Id.*
[9] Hr'g Tr. 31:2-18 (the Debtor's acknowledgement that such amount is insufficient to make all payments due to Secured Lender).

to pay Interest Rate based payments due from August 2009 until the Petition Date and therefore, there would have nonetheless been a continuing monetary default under the Loan through the Petition Date. Moreover, the Secured Lender's determination not to apply the funds in the "lock box" had no effect on the amount of default interest charged to the Debtor since, as aforesaid, that is determined by applying the Default Rate to the Loan Amount which is the principal balance of the Loan.  Given that the amount of funds in the "lock box" would have been insufficient to pay the contract interest, even if the Secured Lender had applied those funds it would not have reduced the Loan Amount.

According to the Disclosure Statement and the Debtor's Schedules, the Debtor posits that the Property has a value of $57.5 million.[10]  Thus, there is no question that the Secured Lender is oversecured.[11]

The Debtor's Schedules reflect liabilities to other creditors of approximately $20 million. The Schedules also reflect that, at the Petition Date, the Debtor had some $13.6 million of assets, exclusive of the Property but inclusive of funds in the "lock box."[12]  Thus, it appears undisputed that the Debtor is solvent.  Under the Plan, the Debtor proposes to pay all non-insider claims in full with interest at the Interest Rate regardless of the outcome of this dispute over the Debtor's obligation to pay Default Rate based interest to cure the Loan.[13]  Moreover, the Plan would permit the Debtor to pay insider claims so long as there is no post-confirmation default in respect of the Secured Lender's reinstated Loan.[14]

---

[10] The Secured Lender has not contested such valuation, at least for these purposes.
[11] The Debtor acknowledges that the Secured Lender is oversecured.  Hr'g Tr. at 42:18-19.
[12] ECF No. 33.  The Secured Lender apprised the Court that at the time of the hearing on the Secured Lender's Objection to the Disclosure Statement there was more than $4 million in the "lock box." Hr'g Tr. at 12:3-7.
[13] Plan at pp. 9-10 (Class 3).
[14] *Id.* at p. 10 (Class 4).

By the Plan, the Debtor proposes to (a) reinstate the Maturity Date of the Loan, with interest from the Effective Date of the Plan at the Interest Rate and (b) to cure monetary defaults under the Loan by paying the Secured Lender unpaid interest which has accrued on the Loan at the Interest Rate, but not interest which has accrued on the Loan at the Default Rate.  The Plan purports to leave "unaltered the legal, equitable and contractual rights respecting the Loan" notwithstanding the fact that the Debtor does not intend to pay the Secured Lender's contractual right to default interest.  According to the Plan, the foregoing treatment renders the Secured Lender's claim unimpaired and thus, the Secured Lender is precluded from voting on the Plan and deemed to have accepted the Plan.

## Discussion

The Debtor claims that section 1124(2) of the Bankruptcy Code serves as authority for the Debtor's ability to reinstate the Loan and to avoid the payment of default interest upon curing its default in the payment of contract rate interest.  The Secured Lender, on the other hand, argues that section 1124(2) merely defines an unimpaired claim and does not provide a mechanism for the forgiveness or nullification of default interest.  Rather, the Secured Lender contends that the authority to include a cure in a chapter 11 plan emanates from section 1123(a)(5)(G) and any such cure must comply with section 1123(d) of the Bankruptcy Code.

The Debtor's position is grounded on *In re Entz-White Lumber & Supply, Inc.*, which held that payment of default interest is not necessary to satisfy the requirement of section 1124(2) that all pre and post petition defaults be cured to unimpair the holder of a claim.  850 F.2d 1338 (9th Cir. 1988).  Under the Ninth Circuit's formulation, "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions.  The consequences are thus

nullified." *Entz-White*, 850 F.2d at 1340 (quoting *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982)).

The *Entz-White* court borrowed from the Second Circuit's opinion in *In re Taddeo* interpreting section 1322 of the Bankruptcy Code on the theory that the concept of "cure" is the same throughout the Bankruptcy Code, irrespective of contravening state law.[15] *Taddeo*, 685 F.2d at 28. In extending this chapter 13 concept, the *Entz-White* court held that a chapter 11 plan may be deemed to have cured all defaults, leaving a creditor unimpaired, even when such plan de-accelerates and reinstates the original maturity of a loan without provision for payment of the economic "consequences of default" such as late fees and default interest.

*Entz-White* and its pre-1994 progeny were principally focused on a single inquiry, absent any explicit guidance in the Bankruptcy Code: just what does "cure" mean in the context of section 1123(a)(5)(G) which authorizes "curing or waiving of any default" under a chapter 11 plan? *Entz-White*, 850 F.2d at 1340. However, the omission from the Bankruptcy Code of any definition for "cure" seems to have been rectified by the enactment by Congress in 1994 of section 1123(d) (and section 1322(e)), which provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). The revision was intended to avert any "windfall" in contrast to the result obtained under applicable nonbankruptcy law and the pre-bankruptcy agreements of the parties.[16]

---

[15] *Entz-White's* reliance on *Taddeo* has been criticized by at least one court in the Second Circuit which observed that *Taddeo* was not concerned with a secured lender's right to default interest and that there is nothing in Second Circuit law to support the view that default interest need not be paid to cure under section 1124(2). *In re 139-141 Owners Corp*. 306 B.R. 763, 772 (Bankr. S.D.N.Y. 2004) (collecting cases and quoting *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959)), *aff'd in part, vacated in part on other grounds by In re 139-141 Owners Corp.*, 313 B.R. 364 (S.D.N.Y. 2004).

[16] The revisions were enacted to overrule the Supreme Court's decision in *Rake v. Wade*, 508 U.S. 464 (1993) requiring debtors seeking to cure pre-petition defaults to pay interest on both prepetition interest and late fees that was neither permitted under nonbankruptcy law nor intended by the parties to the original transaction. Congress was

7

The Ninth Circuit has not addressed the impact of section 1123(d) on 1124(2) since the enactment of 1123(d) in 1994, although the Bankruptcy Appellate Panel of the Ninth Circuit has questioned the continued viability of *Entz-White*. *Hassen Imports P'Ship v. KWP Fin. VI (In re Hassen Imports P'Ship)*, 256 B.R. 916, 924 n13 (9th Cir. BAP 2000) (questioning the future of *Entz-White* holding in light of the 1994 amendments, but noting that the debtor failed to cure before the effective date in the case at bar); *Casa Blanca Project Lenders, L.P. v. City Commerce Bank (In re Casa Blanca Project Lenders, L.P.)*, 196 B.R. 140, 147 (9th Cir. BAP 1996) (noting that the trial court ruled that the 1994 amendments overruled *Entz-White*, but holding that because the statute did not apply retroactively, discussion of the effect of the amendments would be "gratuitous").

While several post-1994 cases from courts in the Ninth Circuit intimate or conclude that *Entz-White* was unaffected by the enactment of section 1123(d) or ignore the fact of the enactment altogether,[17] courts outside the Ninth Circuit have come to a different conclusion. These courts have held that section 1123(d) provides an answer to the inquiry in *Entz-White* and that the cure required under section 1124(2) as a condition of treating a secured claim as unimpaired upon reinstatement is "determined in accordance with the underlying agreement and applicable nonbankruptcy law" as prescribed by section 1123(d). *In re Moody Nat'l SHS Houston*

---

unhappy that *Rake v. Wade* mandated a "windfall to secured creditors at the expense of unsecured creditors" by requiring a debtor pay more than was required of it under state law and the loan documents. Representative Jack Brooks stated that the addition of sections 1123(d) (and 1322(e)) "will limit the secured creditor to the benefit of the initial bargain with no court contrived windfall. It is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." H.R. Rep. 103–836, at 55 (1994) *reprinted in* 1994 U.S.C.C.A.N. 3340, 3364. The "essential thrust" of this statement is that the added language is intended to leave the parties to the rights provided by their agreement and applicable nonbankruptcy law. *In re Adejobi*, 404 B.R. 78, 82 (Bankr. E.D.N.Y. 2009). If Congress had merely meant to address the narrow problem created by *Rake*, it could have simply amended section 1322, but instead it chose to broadly declare that all cures are determined in accordance with state law and the underlying documents. *In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 674 (Bankr. S.D. Tex 2010).

[17] *In re Phoenix Bus. Park Ltd. P'ship*, 257 B.R. 517 (Bankr. D. Ariz. 2001); *In re Zamani*, 390 B.R. 680 (Bankr. N.D. Cal. 2008); *In re Udhus*, 218 B.R. 513, 518 (9th Cir. BAP 1998); and, *In re DSBC Inv., LLC*, 2009 WL 2998940 (Bankr. D. Ariz. 2009).

*H, LLC*, 426 B.R. at 674-676; *Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.)*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 327-28 (Bankr. S.D.N.Y. 2011); *In re 1 Ashbury Court Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010, at *4 (Bankr. D. Kan. 2011). Consistently, these courts have held that section 1124(2) does not alter a secured lender's rights, but rather sets forth the definition of unimpairment for purposes of determining presumed acceptance pursuant to section 1126(f). *Moody Nat'l,* 426 B.R. at 670.

These courts have rebuked attempts to circumvent section 1123(d) by transforming section 1124(2) from a definitional statute into one giving rise to substantive rights. *Id.* at 672. One court held that this argument "perverts § 1124(2)(B) into a mechanism by which a debtor has substantive authority to truncate a creditor's contractual and state law rights to collect default interest" and "fundamentally ignores the plain meaning of § 1123(d)." *Id.* Another concluded that such an approach would "write § 1123(d) out of the Code," which was "enacted in 1994 for the specific purpose of clarifying . . . that cure and reinstatement required more than simply rolling back the clock as some courts had held." *1 Ashbury Court Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010, at *4.

This Court is persuaded by the reasoning of the foregoing courts (a) that section 1123(a)(5)(G) governs the permissible contours of a plan of reorganization and serves as the authority for curing or waiving a default; (b) that the amount necessary to effect such a cure is determined in accordance with section 1123(d) which reverts to the underlying agreements between the parties and applicable nonbankruptcy law; and, (c) that section 1124(2) governs whether a secured creditor's claim can be treated as unimpaired but does not supplant section 1123(d). *Moody Nat'l*, 426 B.R. at 670-71. This view gives proper recognition to the

9

relationship between sections 1123, 1124 and 1126 of the Code. The Court believes the Secured Lender is accordingly entitled to default interest given that (a) it is not disputed that the Secured Lender is amply oversecured, (b) the Debtor is solvent, and (c) general unsecured creditors will be paid in full, with interest, under the Plan regardless of whether the Debtor is required to pay default interest to the Secured Lender.[18] If the Plan did not provide for the payment to unsecured creditors in full, then a more plausible argument could be made that the Secured Lender was receiving a windfall at the expense of the unsecured creditors. That is not the case here.

### Conclusion

For the foregoing reasons, the Court sustains the Secured Lender's Objection to the Disclosure Statement solely as to the interpretation and application of sections 1123 and 1124(2) of the Bankruptcy Code. The Plan is unconfirmable because it fails to provide for the payment of default interest due to the Secured Lender as an element of the proposed cure of the Loan. If the Debtor can establish in its action against the Secured Lender that any default may be excused, or that default interest is not otherwise due in accordance with the underlying agreement and/or applicable non-bankruptcy law, then the issue of entitlement to default interest is moot. However, based upon the record as it stands, it is

ORDERED AND ADJUDGED that approval of the Disclosure Statement is DENIED.

### ###

---

[18] Several courts have recognized that where a debtor is solvent, reduction of the default rate of interest will only provide an undeserved windfall to the debtor or, as in this case, its equity holders. *In re Courtland Estate Corp.*, 144 B.R. 5, 9 (Bankr. D. Mass. 1992); *In re Hollstrom*, 133 B.R. 535, 539 n.7 (Bankr. D. Colo. 1991); *In re Consol. Operating Partners, L.P.*, 91 B.R. 113, 116-17 (Bankr. D. Colo. 1988). *See also, e.g.*, *In re Southland Corp.*, 160 F.3d at 1060; *In re D.C. Sullivan & Co.*, 929 F.2d 1, 3-4 (1st Cir. 1991); *In re Chicago M.S.P. & P.R. Co.*, 791 F.2d 524, 529 (7th Cir. 1986); *U.S. v. Kalishman*, 346 F.2d 514, 518 (8th Cir. 1965); *Ruskin v. Griffiths*, 269 F.2d 829 (2d Cir. 1959), *In re Vest Assocs.*, 217 B.R. 696, 702-03 (Bankr. S.D.N.Y. 1998); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y. 2002); and *Florida Fin. Corp. v. Dixon (In re Dixon)*, 228 B.R. 166, 176 (W.D. Va. 1998).

Copy furnished to:
Scott L. Baena, Esq.
Bilzin Sumberg Baena Price & Axelrod, LLP
1450 Brickell Avenue, Suite 2300
Miami, FL 33131

Attorney Baena shall serve a copy of this memorandum opinion on all interested parties and file a certificate of service.